**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DEBORAH ANN COLLINS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>NEW ERA LENDING, LLC,<br><br>Defendant. | Case No. 4:26-CV-03829 |

**PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**

**INTRODUCTION**

Defendant's Motion[1] asks this Court to do two things that are unwarranted at the pleading stage.

First, New Era asks the Court to become the first federal court in Texas to hold that consumers may receive unlimited unsolicited telemarketing text messages despite registering their telephone numbers on the National Do Not Call Registry.

Second, it asks the Court to resolve factual disputes about who sent the messages in New Era's favor, notwithstanding detailed allegations directly connecting the challenged solicitations to New Era and New Era's own acknowledgment that Plaintiff's telephone number was contained within its marketing data.

Neither argument supports dismissal. On the principal statutory issue, New Era relies almost entirely on the Seventh Circuit's recent decision in *Steidinger v. Blackstone Medical Services, LLC*, which departed from the overwhelming weight of authority holding that text messages constitute "calls" under the TCPA. That decision is neither controlling nor persuasive here. The Ninth Circuit recently reached the opposite conclusion in *Howard v. Republican National Committee*, and courts throughout the Fifth Circuit—including this District—have consistently concluded that § 227(c) reaches text messages. Most significantly, *Alvarez v. Fiesta Nissan, Inc.* addressed this precise

[1] Defendant's Motion itself appears not to comply with this Court's briefing requirements. Judge Ganjei's Court Procedures limit motions and responses to 5,000 words and require a certificate of word count following the signature block. Court Procedures § 16(c). Defendant's Motion appears to exceed 5,000 words and contains no word-count certificate. See Mot. at 21. Plaintiff nevertheless responds to Defendant's arguments on their merits

question in this District earlier this year and, after independently analyzing the statutory text under *Loper Bright*, held that § 227(c)(5) encompasses text messages. Nothing in *Steidinger* requires this Court to depart from that conclusion.

New Era's factual argument fares no better. Plaintiff does not merely allege that she received generic mortgage advertisements and later discovered that New Era sells mortgages. She alleges that she responded directly to one of the challenged VA-refinancing solicitations, was asked for her email address, and then received the promised refinancing information from a New Era employee using a New Era email address. New Era's President subsequently confirmed that Plaintiff's telephone number was contained within New Era's own records under "Amina Haywood"—the same name used in the challenged messages—and attributed the problem to an issue with New Era's "data and tech." Those allegations easily permit the reasonable inference that the challenged solicitations originated from New Era's marketing activities. Defendant's alternative theory involving an unidentified third party merely presents a factual dispute for discovery.

The remaining arguments similarly seek premature determinations concerning willfulness and prospective relief. Plaintiff alleges approximately twenty solicitations over six months to a number registered on the National Do Not Call Registry for more than twenty years, coupled with New Era's acknowledgment that the number existed within its systems under erroneous information. Whether New Era's conduct was willful or knowing and whether its admitted data problem has actually been corrected are factual matters that cannot properly be resolved on a motion to dismiss.

The Motion should be denied.

## BACKGROUND

Plaintiff Deborah Ann Collins brings this TCPA action arising from repeated unsolicited mortgage-refinancing solicitations sent to her personal cellular telephone number, which has been registered on the National Do Not Call Registry since October 31, 2004. FAC ¶¶ 11–17. Between October 2025 and April 2026, Plaintiff received approximately twenty text messages promoting substantially similar VA mortgage-refinancing products. *Id.* ¶¶ 18–24.

To identify the sender, Plaintiff responded to one of the messages and requested information about the advertised refinancing program. The sender requested her email address and represented that additional information would follow. Plaintiff then received an email from Ali Habhab at **alihabhab@neweralendingllc.com** promoting New Era's VA IRRRL refinancing program and advertising substantially the same refinancing benefits promoted in the text messages. *Id.* ¶¶ 25–29.

The connection was further confirmed after Plaintiff's counsel contacted New Era. New Era's President, Omar Said, acknowledged that Plaintiff's telephone number was contained in New Era's records but associated with a lead named **"Amina Haywood"**—the same first name used in the challenged messages. FAC ¶¶ 31–33. Said explained that New Era had "received this phone number linked to a different client named Amina

Haywood" and that "[s]omething happened with the data and tech so the system did not catch it." *Id.* ¶ 33.

## ARGUMENT

### I. The Do Not Call List provisions in TCPA section 227(c) authorize the FCC to prohibit text messages.

New Era contends that a single use of the word "call" in section 227(c)(5)'s private right of action means that the DNC rules cannot apply to text messages. That's incorrect.

As courts and the FCC have long and recently recognized, the statute's ordinary meaning, structure, and purpose refute that argument: The word "call" as used in the TCPA refers to any attempt to communicate by telephone, so the FCC may prohibit telemarketing texts to numbers on the Do Not Call List. And New Era's arguments for its restrictive interpretation all fail. The company goes about interpreting the word "call" in section 227(c)(5) all wrong, appearing to invent statutory terms to support its arguments, and assigning "call" a meaning that is at odds with the rest of the statute in multiple ways. Moreover, because section 227(c) is structured as an express delegation of discretionary authority to the FCC, any doubt about the answer here simply means that Congress intended the agency's reasonable judgment to control.

It should come as no surprise then that Post *McLaughlin* and *Loper Bright*, the majority of courts have concluded that under the TCPA text messages are calls.[2] Courts

---

[2] *See, e.g., Duron v. Kings Capital Holding,* 2026 U.S. Dist. LEXIS 6340, at *12 (W.D.

in more than thirteen districts, and until last week, the only circuit court to have squarely addressed the issue—the Ninth Circuit—have held that the DNCR provision covers text messages. *See Howard v. Republican Nat'l Comm.*, 164 F.4th 1119 (9th Cir. Jan. 13, 2026) (reaffirming text messages are "calls"). The Supreme Court has also weighed in on the issue in the context of the TCPA's robocalls provision. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call.'")—a proposition so uncontroversial that it was not even contested by the parties there. The Seventh Circuit's recent, lone departure in *Steidinger* does not disturb that consensus. As explained below, *Steidinger*'s reasoning does not withstand scrutiny, conflicts directly with *Howard*, and has no application within this Circuit, where the district courts have spoken with one voice in reaching the opposite conclusion.

**a. The plain meaning of the word "call" includes text messages**

The starting point is the statute's text, which confirms that "call" includes text messages. To interpret a statutory term, courts look to the ordinary meaning of the word near in time to the statute's enactment, including by looking at contemporaneous dictionaries. *See e.g. Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

---

Tex. Jan. 13, 2026); *McGonigle v. Shopperschoice.com,* 2026 U.S. Dist. LEXIS 30157, at *13–14 (M.D. La. Feb. 13, 2026)*; Alvarez v. Fiesta Nissan, Inc.,* 2026 U.S. Dist. LEXIS 14155, at *10–17 (S.D. Tex. Jan. 26, 2026).

meaning. Therefore, we look to the ordinary meaning of the term . . . at the time Congress enacted the statute . . . . " (citation omitted)).

Courts have long recognized that the ordinary meaning of "call" in the TCPA is "to communicat[e] with or an attempt to get in communication with a person by telephone." *Howard*, 164 F.4th at 1123–24 (quoting *Satterfield*, 569 F.3d at 953–54 & n.3). Contemporaneous dictionaries confirm that meaning. *See, e.g.*, *Random House Webster's College Dictionary* (1991) ("to communicate or try to communicate with by telephone"); *Oxford English Dictionary* (2d ed. 1989) ("a summons or communication by telephone"). Those definitions do not require an oral communication; they turn on the means of communication—the telephone. A text message sent to a telephone therefore falls comfortably within the ordinary meaning of a "call." *See Howard*, 164 F.4th at 1123–24.

The established definition of "telephone call" in the TCPA therefore readily encompasses texts. Indeed, both the Seventh and Ninth Circuits have said, in cases alleging violations of section 227(b), that "[t]ext messages to a cellular telephone qualify as a 'call' within the meaning of the statute." *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020); *see Howard*, 164 F.4th at 1123–24; *Satterfield*, 569 F.3d at 954. And, absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning throughout a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). So, the consensus meaning of the word "call" in section 227(b), as encompassing texts, "supports the interpretation that the term 'call' as used in § 227(c) also encompasses 'text messages.'" *Mujahid*, 2025 WL 3140725, at *2.

The meaning of the word "call" is especially clear in the nearby autodialer

provisions in section 227(b) of the original TCPA. The word "call" is used extensively in those provisions prohibiting automatic dialing technology and robocalls. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any call … to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone number to call. So the use of the word "call" in connection with pagers in section 227(b) establishes "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano*, 702 F. Supp. 2d at 1005; *see also Abbas v. Selling Source, LLC*, No. 09 Civ. 3413, 2009 WL 4884471, at *4 (N.D. Ill. 2009).

The FCC has long endorsed that interpretation of the word "call." The agency determined as early as 2003 that when the TCPA says "call," it must mean not just traditional voice calls but also text messages. 18 FCC Rcd. 14014, 14115 ¶ 165 (Jul. 3, 2003). As the FCC recognized then, the statutory text "encompasses both voice calls and text calls to wireless numbers." *Id.* And the FCC has adhered to that position ever since. *See* 30 FCC Rcd. 7961, 8020 ¶¶ 115–16; *Hernandez*, 2018 WL 6830220, at *1 ¶ 3; 88 Fed. Reg. 20800, 20802 ¶ 6; 38 FCC Rcd. 12247, 12256–57 ¶ 26.

If anything, even though it is only briefly discussed in the relevant order, the FCC's 2003 interpretation of the word "call" to include texts is especially helpful to understanding the word's original meaning as of 1991. *See* 18 FCC Rcd. at 14115 ¶ 165. When Congress originally drafted the TCPA, text messages were not yet mainstream. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015); *Medvidi*, 2025 WL

2856295, at *2. And texting didn't achieve widespread popularity until the 2000s.[3] So the FCC's understanding of "call" in 2003 surely approximated its 1991 meaning more closely than our 2025 intuitions, which reflect a world where texting has been ubiquitous for decades. *Cf. Raimondo*, 603 U.S. at 386 ("[T]he contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect.").

Nor does § 227(c)(5)'s use of "telephone call," rather than simply "call," change the analysis. The contemporaneous dictionaries on which New Era itself relies did not define a "telephone call" as necessarily involving voice communication. They defined "call" as communicating or attempting to communicate "by telephone." *See*, *e.g.*, Webster's Ninth New Collegiate Dictionary (1991); Random House Dictionary of the English Language (2d ed. 1987). "Telephone" therefore identifies the medium of the communication; it does not impose an unwritten voice requirement. A text message sent by telephone remains a communication by telephone.

So even post-*Loper Bright*, "the significant weight of case authority" supports interpreting "call" to include text messages. *Better Mortg. Corp.*, 2025 WL 3493815, at *9. In sum, the FCC's conclusion that "the term 'call' includes a text message" therefore reflects "the plain meaning of the statutory text as it has been understood by consumers,

---

[3] *See, e.g.*, David Crystal, *Toting: The Gr8 Db8* 4 (2008), https://perma.cc/M2Q3-FH44 ("The average number of texts per GSM customer in 1995 was 0.4 per month; by the end of 2000 it was still only 35."); Meghan Keane, *Texting Overtakes Voice in Mobile Phone Usage*, Wired (Sept. 29, 2008), https://perma.cc/CB7E-EZQZ (noting that the number of text messages surpassed the number of voice calls for the first time in 2007).

the FCC, and courts since the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *3. The statute's structure confirms this reading.

**b. That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions.**

Much of New Era's argument focuses on the single use of the word "call" in section 227(c)(5). But reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call List provisions of section 227(c) further confirms that text messages are covered.

To see why, start with the core of section 227(c)—its prohibition on "making or transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are "ma[de] or transmitt[ed]" to a "telephone number." *Id.* § 227(e)(8)(C). And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers: The FCC determined that cell phone subscribers are covered when it first created the Do Not Call List rules, *see* 18 FCC Rcd. 14014, 14037–39 ¶¶ 33–36 (2003), and courts have overwhelmingly agreed with that interpretation of the statute ever since, *see, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

As explained above, "the ordinary, contemporary, and common meaning" of the word "call" in the TCPA includes text messages. *Satterfield*, 569 F.3d at 953–54 & n.3; *see supra*, Part I.A. And contemporary definitions of the word "message" do too—a

message in 1991 was "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*." *Message*, *Black's Law Dictionary* (6th ed. 1990), https://perma.cc/MTC3-H47K (emphasis added).[4] So "call" and "message" both describe communication with a phone, and neither differentiates between oral and written mediums. Finally, the purpose of the DNC provisions further supports that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). "[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *accord Howard*, 164 F.4th at 1124; *Mujahid*, 2025 WL 3140725, at *2; *Medvidi*, 2025 WL 2856295, at *3; *Skopos Fin., LLC*, 2025 WL 2029274, at *4. Indeed, nothing in the statute gives any suggestion that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 WL 2856295, at *3.

**c. The other Federal Courts in Texas and elsewhere in the Fifth Circuit that have considered this question got it right.**

Consistent with the statute's text and structure, courts—particularly within the Fifth Circuit—have overwhelmingly held that text messages qualify as calls under the TCPA. Defendant's position would undermine that system if text messages were excluded from § 227(c)'s protections, telemarketers could simply bypass the Registry by

---

[4] *See also, e.g.*, *Message*, *Random House Webster's College Dictionary* (9th ed. 1991) ("a communication delivered *in writing*, speech, by means of signals, etc.") (emphasis added); *Message*, *Oxford English Dictionary* (2d ed. 1989) ("an oral *or written* communication sent from one person to another") (emphasis added).

shifting from voice calls to texts. Luckily for consumers, the federal courts in the Texas and this Circuit have gotten the analysis correct. Most importantly, this precise issue has already been decided in this District. In *Alvarez v. Fiesta Nissan, Inc.*, Judge Crane independently examined the ordinary meaning of "telephone call" at the time of the TCPA's enactment, the statutory context, and the structure of § 227(c), and concluded that a text message "falls reasonably within the literal language of the statute." 2026 U.S. Dist. LEXIS 14155, at *10–17 (S.D. Tex. Jan. 26, 2026). Judge Crane further concluded that both "the original text and the context support reading § 227(c)'s cause of action to include text messages within its prohibition on violative 'telephone calls.'" *Id.* at *17. Accordingly, the court declined to dismiss the plaintiff's § 227(c)(5) claim. *Id.*

New Era's criticism of *Alvarez* is misplaced. *Alvarez* did not defer to the FCC or rely on policy considerations. Applying the analysis required by *Loper Bright*, the court independently examined the ordinary public meaning of the statutory language in 1991, contemporaneous dictionaries, and the TCPA's statutory context and structure. *See Alvarez*, 2026 U.S. Dist. LEXIS 14155, at *10–17. *Steidinger*'s subsequent disagreement with that analysis does not make *Alvarez* any less persuasive, much less require this Court to reject the conclusion already reached within this District.

Following Judge Crane, another court in the Fifth Circuit adopted the same analysis in *McGonigle v. Shopperschoice.com*, 2026 U.S. Dist. LEXIS 30157, at *13-14 (M.D. La. Feb. 13, 2026). Other courts in the Fifth Circuit have unanimously followed. Indeed, Judge Love explained in the Eastern District of Texas, "As to the matter of whether text messages are covered under §§ 227(b) and (c), numerous federal courts of

appeals, including the Fifth Circuit, have held that § 227(b) applies to text messages, or assumed so without deciding the issue. None has construed either provision not to cover text messages…*Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 688 (5th Cir. 2021) ("Robocalls and robotexts are nuisances. Congress banned them in the… TCPA.")…Naturally, this court would follow suit with respect to these provisions of the TCPA having been interpreted to cover text messages.”.

Finally, as Judge Torres held recently, “The Court is persuaded by the reasoning of the overwhelming majority of cases confirming cell phones are residential phones for purposes of the act and more importantly, that text messages are actionable under §227(c)(5).” *Callier*, 2026 U.S. Dist. LEXIS 120642, *18; *see also Duron*, 2026 U.S. Dist. LEXIS 6340, at *12. The Fifth Circuit district courts, including two judges of this District within it, have spoken with one voice: text messages qualify as “calls” under the TCPA and are subject to the same restrictions as voice solicitations. Excluding texts from the Registry would nullify Congress’s protections, allow telemarketers to exploit the dominant form of communication today, and erode consumer trust. Because the statutory text, the FCC’s consistent interpretation, and precedent all confirm that texts fall within the TCPA’s scope, Defendant’s attempt to carve out an exception must be rejected. The Registry continues to protect numbers, not loopholes.

## II. The Amended Complaint Plausibly Alleges New Era Sent the Challenged Contacts.

New Era’s direct-liability argument depends on isolating each factual allegation and disregarding the sequence of events alleged in the Amended Complaint. The

question is whether the facts alleged, taken together and with reasonable inferences drawn in Plaintiff's favor, plausibly establish that New Era initiated the contacts. They plainly do.

Plaintiff received repeated solicitations promoting VA mortgage-refinancing products. FAC ¶¶ 18–24. Those messages were not isolated or unrelated communications; they repeatedly promoted substantially similar VA IRRRL and VA Streamline refinancing programs and substantially similar benefits over a period of months. *Id.* ¶¶ 19, 21–24.

Plaintiff then tested the source of those solicitations. She responded to one of the messages and requested information about the refinancing program specifically to determine who was contacting her. FAC ¶ 25. The sender requested Plaintiff's email address and represented that application materials and additional information would be sent. *Id.* ¶ 26. What happened next is critical: Plaintiff received an email from Ali Habhab at alihabhab@neweralendingllc.com, promoting New Era's VA IRRRL refinancing program. *Id.* ¶ 27. The email advertised the same types of benefits promoted in the text messages—including lower rates and payments, skipped payments, escrow refunds, and reduced underwriting requirements—and expressly identified New Era and contained New Era's branding and contact information. *Id.* ¶¶ 28–29.

New Era attempts to dismiss this sequence as a mere "post hoc" connection because Plaintiff responded to the solicitation before receiving the New Era email. Mot. at 12–13. But Plaintiff's response did not create the connection between the solicitation and New Era; it revealed it. Plaintiff did not independently locate New Era, contact New

Era through its website, or ask New Era to send her mortgage information. She responded directly to the challenged solicitation, supplied an email address when requested by its sender, and then received the promised refinancing information from a New Era email account promoting New Era's refinancing program. That sequence supports the straightforward inference that the solicitation was being used to generate prospective customers for New Era.

More importantly, the allegations do not end there. After Plaintiff's counsel provided New Era with the challenged text messages, New Era's own President confirmed that Plaintiff's telephone number was contained within New Era's systems. FAC ¶¶ 31–33. He specifically stated that New Era had "received this phone number linked to a different client named Amina Haywood," that the number did not link to Deborah "on our end," and that "[s]omething happened with the data and tech so the system did not catch it." *Id.* ¶ 33.

That admission is particularly significant because the challenged messages themselves repeatedly addressed their recipient as "Amina." FAC ¶¶ 20, 34. New Era thus possessed Plaintiff's telephone number in its systems under the name "Amina Haywood," while the mortgage-refinancing solicitations sent to that same number addressed their recipient as "Amina." Plaintiff alleges that this was not information she supplied to anyone and that she never provided her telephone number to New Era. FAC ¶¶ 34, 37–40. The correspondence between the erroneous name used in the solicitations and the erroneous name associated with Plaintiff's number in New Era's own systems supplies an additional factual link between New Era and the challenged campaign.

Courts routinely reject arguments like Defendant's where, as here, the complaint alleges facts plausibly connecting the challenged calls to the defendant and showing that the calls promoted the defendant's products or services. Those allegations are sufficient to support a reasonable inference of direct involvement at the pleading stage. "At first glance, these allegations seem like a strong basis for attributing the … [calls and text] to the Defendant. After all, when a person introduces herself across the table as Olivia or Emma --- we generally conclude without much hesitation that is indeed who she is." *See Bradshaw v. CHW Grp., Inc.*, No. 24-cv-00114 (MEF)(JBC), 2025 U.S. Dist. LEXIS 13649, at *5-6 (D.N.J. Jan. 24, 2025) ("So too as to the December 8 call. The caller allegedly introduced herself as 'Erica . . . from the Defendant.' Why then would it not be plausible to conclude that she was, in fact, 'Erica . . . from the Defendant'?").

"The logic of this approach is reflected in the decisions of any number of federal courts. *See, e.g., Marks v. Unique Lifestyle Vacations, LLC*, 2024 U.S. Dist. LEXIS 41804, 2024 WL 1051974, at *3 (E.D. Pa. Mar. 11, 2024); *Katz v. CHW Grp., Inc.*, 2023 U.S. Dist. LEXIS 176206, 2023 WL 6445798, at *4 (W.D. Ark. Sept. 29, 2023); *Smith v. Am.-Amicable Life Ins. Co.*, 2022 U.S. Dist. LEXIS 62115 at *2 (E.D. Pa. Apr. 4, 2022); *Adam v. CHW Grp., Inc.*, 2021 U.S. Dist. LEXIS 170620, 2021 WL 7285905, at *5 (N.D. Iowa Sept. 9, 2021)." *Id.*; *accord Taylor v. Suntuity Solar L.L.C.*, No. 8:23-cv-00694-MSS-AEP, 2024 U.S. Dist. LEXIS 38838, at *15-16 (M.D. Fla. Mar. 6, 2024) ("Plaintiff's allegations are sufficient to plead a claim for Defendant's direct liability under the TCPA at this stage. Plaintiff alleges Defendant initiated the telemarketing calls. Specifically, Plaintiff alleges, 'The Plaintiff received calls from Suntuity Solar on at least

January 31 and February 8, 2023.' Plaintiff further alleges: 'During both calls, Plaintiff was initially provided a generic, fake name, "solar of America."' 'The only real company identified during the calls was Suntuity.'" (cleaned up)); *see also Slominski v. Globe Life Inc.*, No. 7:23-CV-1081-D, 2024 U.S. Dist. LEXIS 24378, at *15 (E.D.N.C. Feb. 12, 2024) ("Slominski alleges that on March 14 and March 15, 2023, she received calls and voicemail messages on her cell phone that asked her to call Globe. The voicemail messages concerned 'an insurance plan.' Globe sells insurance plans. … Defendants contend Slominski fails to plausibly attribute the alleged prerecorded voicemail messages to Globe. Slominski, however, plausibly alleges enough information about the contents of the voicemail messages she received on March 14 and March 15, 2023, to survive a motion to dismiss." (cleaned up)).

New Era's contrary argument asks the Court to draw factual inferences in New Era's favor. According to New Era, its President's statement is "equally consistent" with an unidentified third-party lead generator having independently obtained Plaintiff's number, associated it with Amina Haywood, sent the challenged messages, and then transmitted the lead to New Era. Mot. at 12. But that hypothetical sequence is not alleged in the Amended Complaint. New Era identifies no particular third party in its Motion, no independent marketing campaign, and no factual basis for concluding that some unidentified entity—not New Era—was responsible for the messages. Its proposed explanation is itself a competing factual theory concerning how Plaintiff's telephone number entered New Era's systems and how the challenged marketing campaign

operated. Those are matters for discovery, not a basis to disregard the reasonable inference arising from the facts Plaintiff actually pleaded.

Taken together, these allegations plausibly establish that the challenged messages originated from New Era's marketing activities and that New Era initiated or caused them to be initiated. Whether discovery ultimately reveals that New Era transmitted the messages through its own employees, its own technology, or a third-party platform acting at New Era's direction is a factual question that cannot be resolved from the pleadings. New Era's competing account of how its own marketing data, products, employee communications, and Plaintiff's telephone number all became connected to the challenged solicitations presents a factual defense—not a pleading defect.

## III. Plaintiff Adequately Pleads Willful or Knowing Violations.

Defendant also challenges Plaintiff's request for enhanced damages, but the Amended Complaint plausibly alleges willful or knowing conduct. Plaintiff alleges that her number had been registered on the National Do Not Call Registry for more than twenty years, yet she received approximately twenty substantially similar telemarketing solicitations promoting New Era's products over six months. FAC ¶¶ 14, 18–24, 43. New Era's President subsequently acknowledged that Plaintiff's telephone number existed within New Era's systems under the name "Amina Haywood" and stated that "[s]omething happened with the data and tech so the system did not catch it." FAC ¶¶ 31–33.

Whether that admitted failure resulted from an innocent mistake or from deficient practices demonstrating willful or knowing conduct is a factual question that cannot be

resolved on the pleadings. Indeed, determining what New Era's system was supposed to "catch," what information New Era possessed concerning Plaintiff's number, and what procedures it employed to comply with the National Do Not Call Registry necessarily requires discovery. Nor does the fact that Plaintiff does not allege additional messages after counsel notified New Era establish that the preceding violations were not willful or knowing.

In any event, the TCPA's willful-or-knowing standard does not require Plaintiff to plead that New Era knew its conduct violated the TCPA; it is sufficient that the underlying conduct was intentional rather than inadvertent. *See Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1151 (N.D. Ill. 2014); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 U.S. Dist. LEXIS 37310 (N.D. Ill. Mar. 19, 2013). Whether the evidence ultimately warrants enhanced damages should therefore be decided on a developed record rather than on a motion to dismiss.

## IV. The Plaintiff Adequately Pleads her Request for Injunctive Relief

Defendant likewise prematurely seeks dismissal of Plaintiff's request for injunctive relief. The TCPA expressly authorizes an action to enjoin violations of § 227(c), and Plaintiff alleges facts supporting a risk of recurrence. New Era's President acknowledged that Plaintiff's telephone number existed within New Era's systems under incorrect identifying information and explained that its "data and tech" failed to catch the problem. FAC ¶¶ 31–35. That alleged failure resulted in repeated solicitations over a period of months.

Nothing in the pleadings establishes that New Era has removed Plaintiff's number from its systems, corrected the "Amina Haywood" record, ceased the challenged practices, or otherwise eliminated the risk of recurrence. Defendant instead relies on the absence of additional alleged messages after counsel notified it. But whether New Era has actually corrected the admitted problem is a factual issue that cannot be resolved against Plaintiff on the pleadings.

Courts have declined to eliminate TCPA injunctive relief at this preliminary stage where the allegations support an inference of continuing or future violations. *See Abramson v. AP Gas & Elec. (PA), LLC*, 2023 U.S. Dist. LEXIS 18996, at *14–15 (W.D. Pa. Feb. 6, 2023); *Owens-Benniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300, 1314–15 (M.D. Fla. 2017). Plaintiff's request for injunctive relief should therefore not be dismissed before discovery.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant New Era Lending, LLC's Motion to Dismiss in its entirety. The Amended Complaint states a claim under § 227(c)(5), plausibly alleges that New Era was responsible for the challenged solicitations, and adequately pleads a basis for enhanced damages and injunctive relief. To the extent the Court concludes that any allegation is deficient, Plaintiff alternatively requests leave to amend.

RESPECTFULLY SUBMITTED AND DATED this August 25, 2026.

PLAINTIFF, on behalf of herself

and others similarly situated

By: */s/ Anthony I. Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

**CERTIFICATE OF WORD COUNT**

Pursuant to Section 16(c) of Judge Nicholas J. Ganjei's Court Procedures, I certify that this Opposition contains 4,906 words, excluding the case caption, table of contents, table of authorities, signature block, and certificates, as permitted by the Court's Procedures. The word count was calculated using the word-count function of Microsoft Word.

*/s/ Anthony I. Paronich*
Anthony I. Paronich